Please, the Court, my name is Douglas Nelson on behalf of Ms. Mousa. You will be hearing her brother's case, Mr. Mousa, after this case. You may be asking, why are we before this Court considering the conditions that exist in Iraq today? Because we have a problem with credibility that must be resolved. As a practical matter, if this case is remanded without the petitioner's credibility issue being decided, what the immigration judges routinely do is say, yes, conditions have changed, yes, Chaldeans are in great peril, but I found this person not credible, and until I find otherwise or a court overturns my credibility decision, I'm not going to change my opinion as to whether the person deserves asylum or not. Let's suppose, just I'd appreciate your starting that way because it's very confusing, the way these cases are all shaping up, and we'll get to that in some of the other cases perhaps. But in your client's situation, she was found not credible. The rape and the like, he disregarded that. So if we were to say that that is not supported by substantial evidence, what would we be doing by way of remand or what would be open on the remand insofar as your perspective on the cases? Finding the petitioner credible would mean that the court would be compelled to find she suffered past persecution. And by doing so, it shifts the burden to the government to prove that it would be safe to return her to Iraq. Well, that assumes that it would be on a protected ground. Correct. In other words, that she was raped because of religious or political views. That's correct. So we'd have to find that as well. That's correct, Your Honor. And I think that the facts clearly show that. Isn't there a middle ground? I'm sorry? Isn't there a middle ground? What would that be, Your Honor? Well, if we were to find, obviously a hypothetical question, that the IJ's reasons for making an adverse credibility determination are not supported by credible evidence and that without that finding her testimony is credible, isn't the proper route posed to Ventura to send it back to the agency and say, now assess the claim in light of our determination that her testimony should be considered credible? That's accurate, Your Honor, yes. And, again, if this court finds that substantial evidence shows that she is credible, then I think clearly the lower courts would be compelled to find that she did suffer past persecution and the burden would shift to the government. Now, in this case, the IJ, one of the stated reasons for making the adverse credibility determination was that she omitted reference to the rape incident in her asylum application. Do I have that factually right? That's correct. The most she said in her application is that they abused me with their hands and she added her brother's application for asylum to her application as an exhibit. And in his application he said, when we were traveling outside of Iraq, she told me that she had been abused sexually. Now, when we examine the testimony also that she provided, it's clear that the abuse occurred. We have to put it in the context of her circumstances. She's raised Catholic in a predominantly Muslim society. She's very ashamed of what happened to her. In fact, she calls what happened to her dark memories and that her honor was taken. Her description of rolling up in a ball so that they couldn't touch her I think is also very convincing. And, indeed, the hearing was interrupted because she became too emotional to describe it. So the fact that she didn't fully disclose this I think actually proves her claim. If she had told every person she came in contact with what had happened to her, I would be suspicious. Did she have counsel? I'm sorry. Did she have counsel in completing the asylum application? Yes, she did. Yes. And I was counsel. The same counsel who represented her brother Lathe? That's correct. I represented both. And we were not able to join the cases. Joinder of immigration and asylum cases in the San Diego court is very difficult. Although we try to join them, it's usually rebuffed. But you represented them from the beginning. That's correct, except I did not represent them at the border or when the government interviewed them in the credible fear interview. After they had passed those interviews, then I took on the case. What do we do with the IJ's finding that you were told by the brother about the rape? For that reason, we attached the brother's application. Well, the IJ used it to support the finding of non-credibility on the ground that here she's saying she didn't want to tell anybody, but she had told her brother, and her brother had told you. My concern is if you and the brother knew about the rape, why wasn't that surfaced in her side of the case? Because the most she was willing to say is that they abused me with their hands. When you enter the immigration court, there are often witnesses there from the community. There's an interpreter from the community. These clients regularly see them at the market or at their church. I mean, there's only two large churches in the Calvin community in all of San Diego. And she's ashamed. She was ashamed to reveal it. But when you see how she explained it to the immigration judge and her reluctance to do so, I think her testimony is very convincing. We'll follow on to Judge Fisher's question. It sounds like before the hearing, you knew about the sexual assault. Correct. Did you make any effort to tell the immigration judge before the testimony started about this and her reluctance to describe it and why? We had attached the brother's application, which described it. That's not an answer to my question. My question is, did you tell the IJ before you began your examination of your client that you had been told she had been sexually assaulted and that for cultural and religious reasons she was ashamed to describe it in any kind of detail? No. Outside of her testimony, no. But she had obviously been prepared to present that testimony. How much time elapsed between the time you prepared the application and the time of the hearing?  Was there any impediment to your amending the petition once you found out about the sexual assault? No, but it was already a matter of record in the brother's application, which was attached to hers. You thought you were amending her petition by attaching her brother's? Not amending, but explaining what he knew about her case. And she told you she would only say that she had been touched sexually? That they had abused her with their hands. Now, what you're driving at, Your Honor, is when someone does that. I'm not driving at anything, counsel. I'm just asking what happened. That's all. That's fine. It's akin to the case where a person doesn't disclose everything at an airport interview, but they later disclose it entirely in front of the immigration judge. An application for asylum can only be so large. And the testimony allows the parties to expound upon that testimony. And that's exactly what she did. She said that she was physically abused by their hands. The brother said that she told him she was sexually abused, and then we have her credible testimony to show that she was abused. May I reserve the remaining time for rebuttal? Well, do you have an opportunity before the immigration judge to talk to the immigration judge in private or somehow let them know what's going to happen? Absolutely not. They are very strict about that, Your Honor. Everything that is said in court is recorded on the recorder. There are no meetings outside of the courtroom. And so, no, you do not have that opportunity. It must be done all on the record. And that is particular to the San Diego Immigration Court. Other immigration courts do not do that, but they are very strict about that in San Diego. I thought on this tape, I thought there was an off-tape discussion when this whole – well, maybe it was in one of the other cases. Okay. This judge, he's now the assistant chief immigration judge for the Southern District. And, no, he's very, very particular about that. So, no, there were no off-record conversations. Thank you. May it please the Court, my name is Ian Hoffman, and I represent the respondent of the United States of America. This case involves Maha George Moussa, a citizen of Iraq and a graduate of an Iraqi college who left her family in northern Iraq and came to the United States and, with the assistance of counsel and family members, prepared an application for asylum. The petitioner makes two main arguments in her petition, each of which should fail. The first argument is that she's entitled to asylum and withholding of removal. The immigration judge and the Board of Immigration Appeals found the petitioner to be not credible, which is what we've discussed. What's the policy of the government of the United States about sending people back to Iraq, given its current condition? That's a good question, of course, Your Honor, and I tried to research it before I came here. What I found is that the official policy of the United States is that we are still repatriating people. Whether in practice that's happening or not, I got conflicting responses, and so I cannot honestly tell the Court that I know what we're doing. Doesn't the current State Department country report show significant danger to Iraqi Christians currently? 06 is the current report, isn't it? I don't know what the current report shows, Your Honor. I have the 06 report in front of me, and I just ask about it for informational purposes. But have you read it? I have not, Your Honor. Well, it says two things to me. One, that conditions are terrible for Christians in the country. Is that in northern Iraq as well, Your Honor? Well, let me go to my second point. The first point is conditions are terrible. Priests are being threatened. Churches are being firebombed. It's difficult, if not impossible, to worship on Sunday. People who are identified as Christians are forced out of their homes. Christian women are forced to wear burqas. And second, that that danger persists even in the Kurdish region, the northern region of Iraq. Now, whether this is a fact or not, it leads to this question. The record as we have it, because the immigration hearing occurred in what, April of 03? Yes, Your Honor. That was right after the fall of the Hussein regime? Right, Your Honor. In fact, all four of the Iraqi Christian asylum, et cetera, claims we have before us this week, the person fled when the Saddam regime was still in power. Correct. Correct. But their asylum hearing occurred sometime between the fall of the regime in Baghdad and, for lack of a better description, mission accomplished, right? Right, Your Honor. There certainly was a change in circumstances between when the application was originally filed and when the hearing was held. Irrespective of the outcome in this proceeding, whatever the proper outcome might be, is this woman entitled to ask the VIA to reopen? She has not asked. I'm not asking if she has. Is she, can she, under the regulation, even at this date, ask the board to reopen? I don't know the answer to that, Your Honor. That leads to sort of my penultimate question. Would the government be willing to mediate these four cases, understanding that these people can move to reopen, and no one would argue that the conditions are not different than they were in April of 2003, would they? No, I don't think anyone would argue that. Okay. Have you talked with your superiors, your client, about whether they'd be willing to mediate these cases? I haven't, Your Honor, and I should tell you that normally I'm an antitrust attorney, so my ---- I mean, yeah, they just threw you into the mouth of the lion, right? That's a fair statement, Your Honor. Well, I'm sorry we don't have a vertical or horizontal conspiracy or price fiction. Let me ask this. Are you at the antitrust division? I see you're in Cleveland, but you're with the DOJ antitrust division? Correct, Your Honor. Okay. So is there anybody appearing in any of the other? Is Alizash Lamarney? Yes. You're from Main Justice in Washington? Yes. And would you be better able to answer some of these questions? Yes. Thank you. Why don't we take him off the hook? Well, let me. Yeah, you're off the hook. You know, we're not going to let you ride out of the valley of ---- of the shadow of death. But, you know, the AJ found that when this hearing was held in April, well, that the Christians were able to practice their religion in Iraq. Yes, Your Honor. And I think you referred to a State Department report. Do you know what report he was referring to? I don't know what, Your Honor. I do know that in the second Iraqi case, the ---- well, I guess I won't refer to the record of the other case. Yeah, that's all right. No, because I've got the country report from 2001 that's dated March the 4th, 2002. And, you know, it's a long report and it's just replete with all kinds of statements about the government severely restricting speech, press, religion. And it just goes on for pages. The government neglects the health and nutritional needs of children, discriminates against religious minorities and ethnic groups, and the Christians are a religious minority there. Yes, Your Honor. In 2001, I think the circumstances were fundamentally different. I know that this isn't your field, but if you just look through this long report, human rights organizations and opposition groups continue to receive reports of women who suffered from severe psychological trauma after being raped while in custody. Security forces also reportedly sexually assaulted both government officials and opposition members in order to blackmail them into compliance. And, I mean, this goes on, you know, for pages and pages and pages here on rape, on discrimination and punishment and all the rest of it. Well, certainly, yes, certainly. You know, I just sometimes wonder what world this IJ was living in. Well, Your Honor, in 2001, I don't think anyone would argue, and certainly the government wouldn't argue, that some women were raped in Iraq. But the question was whether the petitioner was someone who was raped and whether her testimony was credible. And certainly you indicated as well that there was. What wasn't credible about her testimony? Well, the things that we've discussed before, that on one hand, she said that she had not told anyone that she had been raped, and yet her brother. So she told her brother. She told her lawyer. Right. That's all. And women don't go around and announcing a horrible experience like that. In that culture, too, don't women who get raped get stoned? That may well be, Your Honor. Well, I mean, you read about it in the papers all the time. Yes, Your Honor. There were other reasons why the IJ found that her testimony was not credible. What else? The IJ said that she had two chances in written statements, which presumably would be easier to say that she had been raped if she would just have to tell her attorney, and then her attorney could put that in a written statement. But in both of those written statements, she failed to mention that. It was only at the final hour at the hearing where she made the statement publicly that she had been raped. Did she say what the counsel said, which is that they abused her with their hands? Was that in the written statement? That was in the written statement, Your Honor, but the rape was not. What would that mean, abused her? What would the IJ think that meant, abused her with their hands? I don't know what he think it meant, Your Honor, other than he thought that it didn't mean rape, which is what she later testified to. Okay. All right. I just have one further just comment. Yes, sir. Can you ever do another one of these cases again? I think that's likely, Your Honor. No, no, I'm making no comment on your argument, which is perfectly fine. You're an antitrust lawyer. That's what you do most of the time. You're asked to fill in. But, you know, 10 years from now, you may look back on this experience and reflect on what it meant for the individuals involved. And the reason I mention that is you may be asked by your seniors in the department whether you would recommend mediation of these cases. And without making any commitment at all, I want you to think about that and think about what it means and will mean to you in the future. Okay? I will do that, Your Honor. You know, we're in a very, very dark period of our history, the way we're treating people. I would agree with that completely, Your Honor. I think the way we treat people is a national disgrace. You'll get no argument from me, Your Honor. I know. He's got to come back for the next case. Yeah, stay out of the Cleveland Clinic. So far, so good on that count. Thank you. What are you going to do? Are you going to try to snatch something out of the jaws of victory? What else are you going to add? Defeat from the jaws of victory. Anecdotally and quickly, I do have some answers to your questions. Nearly all the Chaldean cases are winning in San Diego. I represent many of them every month. But those with credibility issues are very difficult until someone changes the credibility finding. Second, aggravated felons who are also Chaldean are not being returned. I've never seen an Iraqi returned after 2003, and they sit in jail for sometimes over a year. And third, not only the Department of State country reports, but there are two specific papers published in 2005 and in 2006 called the issue papers, which directly address the Christian problem in Iraq. That's an extraordinary. Are those part of the record before us? Not in this case because, again, we have to resolve credibility. Okay. All right. We'll take the next matter. That's late George Mousa.
judges: Pregerson, Hawkins, Fisher